IN THE UNITED STATES DISTRICT COURT   H 12-003m

FOR THE WESTERN DISTRICT OF WISCONSIN    mm 1-5-12

| UNITED STATES OF AMERICA | ) | INDICTMENT | ~~SEALED~~ |
|---|---|---|---|
| v. | ) | Case No. _____ | |
| DANIEL TEPOEL and | ) | 18 U.S.C. § 1349 | |
| GARRY MILOSEVICH, | ) | 18 U.S.C. § 1341 | |
| | ) | 18 U.S.C. § 1001 | |
| Defendants. | ) | 18 U.S.C. § 1343 | |

THE GRAND JURY CHARGES:

<u>COUNT 1</u>

1.   During the period beginning on or about December 3, 1997, and continuing to March of 2007, in the Western District of Wisconsin and elsewhere, the defendants,

DANIEL TEPOEL
and
GARRY MILOSEVICH,

devised and intended to devise a scheme to defraud and to obtain property by means of materially false and fraudulent pretenses, representations and promises, knowing that said material pretenses, representations and promises would be false and were false when made.

2.   The scheme to defraud by defendants, commonly referred to as a "prime bank scheme" or "high yield program," centered around defendants' false and fraudulent representations that they had unique access to international trading programs between the

top "prime" banks in the world in which bank instruments are purchased at a discount and resold at a higher price, supposedly generating millions of dollars in profits. According to the United States Office of Comptroller of the Currency, these prime bank instruments simply do not exist, nor do the so-called trading programs purportedly involving such instruments.

3. It was part of the scheme to defraud that on December 3, 1997, TEPOEL and MILOSEVICH, along with a third individual known to the grand jury but not named herein, opened a bank account in the name of Rainbow Management Trust, c/o Interstate Mortgage Company, at Republic Bank in Duluth, Minnesota.

4. It was further part of the scheme to defraud that on January 19, 2000, TEPOEL and MILOSEVICH opened a bank account in the name of Interstar Management, LTD at Grenada Cooperative Bank Limited in Grenada.

5. It was further part of the scheme to defraud that from August 1999 to September 2001, MILOSEVICH and TEPOEL, and others directed by MILOSEVICH and TEPOEL, solicited individuals in the Western District of Wisconsin, and elsewhere, to invest in various forms of prime bank guarantees, including foreign bank debentures and overseas currency trading. The defendants told potential investors that their investments involved no-risk and that high rates of return were guaranteed.

6. It was further part of the scheme to defraud that defendants provided written materials explaining the way in which individuals could participate in this "exclusive and secret" "high yield" investment program. These written materials:

2

  a. falsely represented that the world's leading banks engage in a trading program in which high-yield bank instruments are purchased at a substantial discount and sold at a higher price;

  b. falsely represented that only the world's most powerful and stable banks participate in the trading program, and these banks employ strict non-disclosure requirements;

  c. falsely represented that, for the first time, American and Canadian investors could participate in these trading programs because MILOSEVICH and TEPOEL had established the necessary contacts with the "insiders" who run these programs;

  d. falsely represented that these programs are a vehicle commonly used by the very wealthy "where the principal investment is fully secured by a Bank Endorsed Guarantee;" and

  e. falsely represented that investors funds are "never put at risk" and "absolutely and irrevocably" protected.

7. As further part of the scheme to defraud, defendants attempted to deflect potential investors' skepticism about the bank program being "too good to be true" by emphasizing and falsely representing that the trading was regulated by the International Chamber of Commerce (ICC) and ICC Regulation 500. MILOSEVICH and TEPOEL represented that the investment was "unlike any other" because in "other investments, the investor places money at risk, out of his control."

8. It was further part of the scheme to defraud that investors were asked to sign

3

"Private Party Participant Agreements." These agreements were between the investor and either "Interstar Management" or "Windstar Management, LTD." The agreements specified that the investor would deposit a certain amount of funds into "Interstar" or "Windstar" and that the investor would be guaranteed a certain return. Most of the agreements guaranteed "at least a 120% annual return, which can be compounded or paid monthly thereafter." Each agreement was signed by the investor and either MILOSEVICH or TEPOEL. These agreements also prohibited investors from disclosing "any names, addresses, telephone, fax, telex, or e-mail numbers of any contact revealed by Interstar to any third party."

9. It was further part of the scheme to defraud that investors provided money to "Interstar" or "Windstar" in a variety of ways: (a) Some investors gave defendants United States Currency; (b) Some investors gave checks payable to Rainbow Management Trust; and (c) Some investors wired money directly to the Interstar Management Account in Grenada. The checks payable to Rainbow Management Trust were deposited into the Rainbow Management account at Republic Bank in Duluth, Minnesota.

10. It was further part of the scheme to defraud that instead of transferring investor money into prime bank instruments as promised by the defendants, which they could not have done because such programs do not exist, defendants: (a) Spent the money on their own travel and personal living expenses; (b) Gave the money to their family members as gifts; and (c) Spent the money on construction materials and equipment for a failed resort project in Grenada called Cinnamon Hills.

4

11. It was further part of the scheme to defraud that MILOSEVICH and TEPOEL fraudulently maintained the illusion that these prime bank investments existed and lulled investors into believing they would eventually get the money they were promised, by using among others, the following methods:

   a. In 2000, some investors received in the mail quarterly statements supposedly showing the appreciation of their money in their prime bank investment, when in fact none of the money had ever been transferred to any prime bank program.

   b. When investors did not receive the promised returns, MILOSEVICH and TEPOEL gave numerous excuses for the delay, including the events of September 11, 2001, the supposed theft of the money by a third partner in the Cinnamon Hill condominium development, and most recently, theft of the money by government operatives.

   c. In early 2002, after some investors demanded their money, TEPOEL mailed them papers with instructions to do such things as filling out forms and obtaining criminal record checks of themselves in order to facilitate the return of their money. Even after these investors returned the required paperwork, they did not receive any money from defendants.

   d. When defendants learned about state and federal investigations into their scheme, some investors were told that their cooperation with authorities would result in the loss of the money they had invested.

   e. In December 2006, some investors were approached with

5

agreements falsely promising that if they waived their rights to sue the defendants and released the defendants from action by any government agency or court, their original investments would be returned.

  f. On March 16, 2007, MILOSEVICH promised an investor the return of her money if she would just hold on a little longer.

 12. For the purpose of executing and attempting to execute the above described scheme, on or about April 27, 2002, in the Western District of Wisconsin, the defendants,

DANIEL TEPOEL
and
GARRY MILOSEVICH,

knowingly caused to be delivered by the Postal Service mail matter; specifically a letter from TEPOEL to investor B.C.

(All in violation of Title 18, United States Code, Section 1341)

### COUNT 2

From on or about December 3, 1997, and continuing through to March 2007, in the Western District and elsewhere, the defendants,

DANIEL TEPOEL
and
GARRY MILOSEVICH,

knowingly and intentionally conspired with each other, and with others known and unknown to the grand jury, to commit mail and wire fraud in violation of Title 18, United States Code, Sections 1341 and 1343.

(All in violation of Title 18, United States Code, Section 1349).

### COUNT 3

1. The grand jury realleges and incorporates by reference in this count, the allegations set forth in paragraphs 1 through 12 of Count 1.

2. For the purpose of executing and attempting to execute the above described scheme, in or about June or July of 2002, in the Western District of Wisconsin, the defendants,

> DANIEL TEPOEL
> and
> GARRY MILOSEVICH,

knowingly caused to be placed in a post office or authorized depository for mail matter, matter to be delivered by the Postal Service; specifically a letter from investor B.C. to TEPOEL.

(All in violation of Title 18, United States Code, Section 1341)

### COUNT 4

1. The grand jury realleges and incorporates by reference in this count, the allegations set forth in paragraphs 1 through 12 of Count 1.

2. For the purpose of executing and attempting to execute the above described scheme, in or about April or May of 2002, in the Western District of Wisconsin, the defendants,

> DANIEL TEPOEL
> and
> GARRY MILOSEVICH,

7

knowingly caused to be delivered by the Postal Service mail matter; specifically a letter from TEPOEL to investor M.C.

(All in violation of Title 18, United States Code, Section 1341)

## COUNT 5

1. The grand jury realleges and incorporates by reference in this count, the allegations in paragraphs 1 through 12 of Count 1.

2. For the purpose of executing the above described scheme, in or about June or July of 2002, in the Western District of Wisconsin, the defendants,

**DANIEL TEPOEL**
and
**GARRY MILOSEVICH,**

knowingly caused to be placed in a post office or authorized depository for mail matter, matter to be delivered by the Postal Service; specifically a letter from investor M.C. to TEPOEL.

(All in violation of Title 18, United States Code, Section 1341)

## COUNT 6

1. The grand jury realleges and incorporates by reference in this count, the allegations set forth in paragraphs 1 through 12 of Count 1.

2. For the purpose of executing and attempting to execute the above described scheme, on February 3, 2005, in the Western District of Wisconsin, the defendants,

8

DANIEL TEPOEL
and
GARRY MILOSEVICH,

knowingly transmitted and caused to be transmitted in interstate commerce, by means of a wire communication, certain signs, signals and sounds, namely a telephone conversation between MILOSEVICH and investor S.E., such communication occurring in interstate and foreign commerce.

(In violation of Tile 18, United States Code, Section 1343)

## COUNT 7

1. The grand jury realleges and incorporates by reference in this count the allegations set forth in paragraphs 1 through 12 of Count 1.

2. For the purpose of executing and attempting to execute the above described scheme, on March 16, 2007, in the Western District of Wisconsin, the defendants,

DANIEL TEPOEL
and
GARRY MILOSEVICH,

knowingly transmitted and caused to be transmitted in interstate commerce, by means of a wire communication, certain signs, signals and sounds, namely a telephone conversation between MILOSEVICH and investor S.E., such communication occurring in interstate and foreign commerce.

(In violation of Title 18, United States Code, Section 1343)

9

## COUNT 8

On or about September 3, 2004, in the Western District of Wisconsin, the defendant,

## DANIEL TEPOEL,

knowingly and willfully made the following materially false statements and representations in connection with an investigation being conducted by the Federal Bureau of Investigation (FBI), an agency within the executive branch of the United States:

a.  TEPOEL stated he did not have anything to do with "Garry's" investors, was unaware of the terms of the investment contracts, and never took any money from investors in connection with Rainbow Management Trust or MILOSEVICH, when in fact and in truth TEPOEL actively recruited investor victims, took part in seminars discussing the supposed investments, signed investor contracts, received investor funds, deposited investor funds into a bank account within his control at Republic Bank, and used investor funds for his own benefit.

b.  TEPOEL stated that he had nothing to do with Interstar Management when in fact, TEPOEL was on the Board of Directors for Interstar Management, LTD and also, along with defendant MILOSEVICH, had opened a bank account in the name of Interstar Management, LTD in Grenada, and had even utilized funds from that bank account for the purchase of his own home in Barnes, Wisconsin.

c.  TEPOEL claimed that most of the funds deposited into the Rainbow Management Trust/Interstate Mortgage bank account at Republic Bank account were checks from mortgage companies from his mortgage business, and that he knew of no

10

reason why any money from MILOSEVICH'S investors would have gone through any of his bank accounts when in fact, most of the funds deposited in TEPOEL's Rainbow Management Trust/Interstate Mortgage Account at Republic Bank during 1999 and 2000 were investor funds, and TEPOEL knew this was the case, as he was the one depositing most of the money into the account.

(All in violation of Title 18, United States Code, Section 1001)

A TRUE BILL,

_____
PRESIDING JUROR

_____, AUSA
Erik C. Peterson
United States Attorney

Indictment returned: April 19, 2007

11